Raymond A. RANK et al., Appellants,

v.

UNITED STATES of America, Appellee.

No. 21257.

United States Court of Appeals
Fifth Circuit.

May 4, 1965.

**338**

William P. Fonville, Dallas, Tex., James F. Hoge, Jr., Fort Worth, Tex., for appellants.

Myron C. Brown, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., H. Barefoot Sanders, U. S. Atty., Dallas, Tex., David O. Walter, Michael I. Smith, Attys., Dept. of Justice, Washington D. C., for appellee.

Before TUTTLE, Chief Judge, and BROWN and GEWIN, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

■ This case presents the question whether the gain received by the Taxpayer-Optionee on the assignment back to the Employer-Optioner of the unexercised option granted as a compensatory restricted stock option is taxable as capital gain when a transfer of the underlying stock at such time would have been a disqualifying disposition subjecting the proceeds to treatment as ordinary income. In rejecting the Taxpayer's appeal, we agree with the District Court that the gain is ordinary income.

The facts are neither complex nor conflicting. And the case comes to us, as it did below, on stipulated facts which we repeat or paraphrase.

The Taxpayer[1] was an employee of Southern,[2] the optionor. Southern's business was the production and sale of oil, natural gas, and gas distillates. In December 1950, Southern acquired Danciger Oil and Refining Company and substantially all of the personnel of Danciger. Danciger was a much larger company than Southern, with substantially larger reserves. It was vital to Southern that most of the former Danciger personnel remain with Southern. However, Danciger personnel had been allowed to deal in oil and gas leases and royalties outside the scope of their employment, and this practice was forbidden by Southern. In order to give the Danciger personnel a

---

1. For convenience we refer to Taxpayer in the singular. Actually 11 employees (and their wives) are involved.

2. Southern Production Company.

proprietary interest in Southern, and to induce them to remain with Southern a restricted stock option plan was made available to the former Danciger employees, as well as to Southern employees who had not participated in an earlier qualified restricted stock option plan of Southern.[3]

The stock option plan was approved by the stockholders of Southern on May 7, 1952. Under the plan 125,000 shares of the company's Unissued common stock were made available to employees of the company under provisions which qualified as restricted stock options under § 130A of the Internal Revenue Code of 1939.[4]

Restricted stock options under the plan were issued on May 8, 1952 to Taxpayer.[5] The option price was the fair market value of the common stock of Southern on that date ($532.50). None of the Taxpayers exercised his option.

During the summer of 1956 the Board of Directors of Southern authorized negotiations with Sinclair Oil and Gas Company for the sale of its properties. The sale was made. On July 23, 1956, Southern announced the sale of its assets to Sinclair and its intention to comply with § 337 of the Internal Revenue Code of 1954. On August 10, 1956, a plan of complete liquidation was adopted by the Board of Directors of Southern. On October 11, 1956, at a special meeting of its stockholders, a plan of complete liquidation of Southern was approved.

On October 11, 1956, there were options outstanding covering 98,960 shares under the restricted stock option plan.[6] These outstanding stock options represented a problem to Southern, in that in order to qualify for the tax treatment of gains on complete liquidation of a corporation, under § 337 all of the assets of the corporation, less assets retained to meet claims, had to be distributed within one year from the date of the adoption of the plan of liquidation. The existence of these outstanding stock options represented a potential barrier to such complete liquidation within a one-year period. For the purpose of eliminating the options and avoiding thereby possible litigation which would have prevented or delayed the orderly liquidation of Southern within the one-year period, the Board of Directors of Southern authorized the acquisition by Southern of optionees' rights under the outstanding restricted stock options at a price of $11.25 per share.[7]

The holders of all of the outstanding options accepted this offer, and their options were sold to Southern by contracts dated October 25, 1956.[8]

3. Of the 11 employees here involved (note 1, supra), 8 were former Danciger employees.

4. The stock option plan provided that:
(a) The option price per share must be the market value on the date granted and payment upon the exercise of the option was to be made in cash.
(b) The period of each option was for five years from the date granted and they were exercisable not sooner than one year after the grant of the option.
(c) The option expired upon voluntary termination of employment and three months after involuntary termination of employment.
(d) The stock acquired upon exercise of an option was to be restricted against sale or other disposition for a period of six months after acquisition of the stock, or two years after the date of the option, whichever was later.
(e) The options were nontransferable.

5. For the 11 employees, the number of shares totaled 49,820.

6. As will later appear, Taxpayer stresses the facts summarized from this point to note 8, infra, as showing noncompensatory motive. See note 21, infra.

7. The price of $11.25 per share amounted to the difference between the liquidation value of the share of common stock of Southern and the price at which a share of such common stock could be purchased under the option.

8. The contract prescribed payment dates in 1956 and 1957. The contract recited the plan of liquidation effective November 1, 1956, and that the "Employee's employment by [Southern] terminated on said date" and the offer to "acquire the Employee's stock option * * * thereby extinguishing all rights thereunder." It then provided:
"1. The Employee hereby sells, assigns, transfers and sets over to the Company

The liquidation was consummated, the options acquired by Southern, and the agreed consideration paid by it.[9]

Thereafter the Revenue Service determined that the gain was taxable as ordinary income, not capital gains. After timely claim by each of the Taxpayers, the denial thereof, and payment of the disputed taxes, this refund suit was timely filed.

■ The District Judge on these stipulated facts, and one possible excursion into fact finding on his own,[10] held that the Commissioner's determination was correct, and that the gains received from the sale of these options should be treated as ordinary income in the years in which received.

■ ■ At the outset, it bears emphasis that had the stock been issued at this time and then sold—either to a third party or back to the corporation—the very same gains would clearly have been ordinary income since the stock would not have been held the requisite six months to qualify as a statutory restricted stock option.[11] In other words, extinguishing for a consideration the option with its carefully built-in statutory restrictions would, in practical effect, enable the parties to obtain the immediate income tax benefit free of the very conditions prescribed by Congress in this area of high controversy.[12] Of course we recognize

the Employee's stock option to purchase * * * shares of stock * * * in consideration of the payment by the Company to him of [$11.25 per share] * * *.

"2. The Employee hereby represents and warrants to the Company that he is the owner of the aforesaid option, that he has not transferred or attempted to transfer or encumber the option in any manner and that, upon receipt of the payment provided in paragraph 1, all of his rights under the stock option will be extinguished.
* * *

"4. This agreement shall be null and void if the sales to be made on November 1, 1956 are not consummated."

9. The procedure was described in the stipulation as follows:

"The Board of Directors of Southern determined that the company would withhold income tax on the payments made by it to the option holders on the purchase of their restricted stock options on advice of counsel that it was not incumbent upon the company to determine the tax status of the payments made to the option holders in the hands of the recipients of such payments and that the company, to avoid possible controversy with the Internal Revenue Service, should adopt the ultra conservative approach of subjecting these payments to withholding. In its final income tax return, Southern showed the payments to the option holders for their options under the classification of other expense as 'Employees' Stock Option Payments', totaling $1,110,262.00. The stock option payments were not reported in such return as salary or wages. If the entire amount of such payments had been disallowed to Southern as an expense, no tax would have resulted. The final income tax return of Southern was examined by the Internal Revenue Service, and no deficiency was determined."

10. Finding No. "20. These options had no ascertainable market value at the time they were granted."

With or without the presumptive correctness of the Commissioner's implied finding, no other result could have been reached in view of the severe limitations in the option (see note 4, supra).

11. § 421(f), 1954 Code; formerly § 130A (a), 1939 Code, as added by Revenue Act of 1950, § 218(a), 64 Stat. 942. See Treas.Reg. § 1.421–5(a) (2), (b), and (c); Schlesinger, Selected Problems in the Use of Restricted Stock Options, 36 Taxes 709, 718 (1958); Aidinoff, Employee and Non-Employee Stock Options: Recent Developments, 22 NYU Inst.Fed. Tax. 167, 176 (1964); 1 Mertens, Law of Federal Income Taxation § 6.18 at p. 68, 75, and 1964 Cum.Supp. § 6.18, at p. 54 and Oct. 1964 Supp. § 6.18(b) (hereafter cited as "Mertens"; Bittker, Federal Income, Estate and Gift Taxation 524 (3d ed. 1964) ; see also Swenson v. Commissioner, 8 Cir., 1962, 309 F.2d 672, reversing, 37 T.C. 124.

12. See Horwich, A Tale of Two Dicta: The Non-Restricted Stock Option, 18 U. Miami L.Rev. 596, 599 (1964) ; Comment, Taxation of the Stock Option as Intended Compensation, 9 UCLA Law Rev. 703 (1962), and especially at 703 n. 2, referring to Griswold, Cases and Materials on Federal Taxation 540 (5th Ed. 1960); Griswold, Mysterious Stock Option, 51 Ky.Law Rev. 246 (1962). In a sort of

that failure to satisfy the requirements of a statutory restricted stock option or the even more stringent contemporary qualified stock option [13] does not necessarily condemn gain to the unfavored, unwanted, more expensive ordinary income category. There are option plans which either by chance, neglect, accident, or choice are non-restricted. Their utility and tax incidents are the subject of extensive, sometimes hopeful, sometimes despairing writings.[14] But they are not for our decision now, and we readily leave these intriguing problems to another day.

We may do that because Taxpayer in seeking to justify capital gains treatment does not take the route of a non-restricted stock option. Rather, Taxpayer recognizes that this was in form a restricted stock option plan. The capital gains here sought are justified, not on the ground of compliance with that plan, nor as authorized effective modifications of it,[15] but because the stock was never acquired, the option was never exercised, and on the contrary the option was sold.

Taxpayer's theory, as near as we can grasp it, runs this way. Options are property [16] and come within the definition of capital asset.[17] Since Taxpayer was not a dealer in options and it is undisputed that these options were held for more than four years, the gain on sale qualifies for long term capital gain treatment.[18] And contrary to the contention

---

Tinker-to-Evers-to-Chance, Dean Griswold attributes to Schlesinger this from Abraham Lincoln:

> "The following quotation, usually attributed to Lincoln, best appears to sum up the policies for and against the restricted stock option provisions of the Internal Revenue Code: 'People who like this sort of thing will find this the sort of thing they like.'" citing Schlesinger, supra note 11 at 756.

13. §§ 421–423, 1954 Code, as amended by Revenue Act of Feb. 26, 1964, Public Law 88–272, § 221(a). See Mertens, Oct. 1964 Supp. §§ 6.18a, 6.18c; Aidinoff, supra note 11.

14. Horwich, supra note 12; Mullock, Unconditional Non-Qualified Stock Options, 40 Taxes 860 (1962); Lefevre, Non-restricted Stock Options, 20 NYU Inst.Fed. Tax. 353 (1962); Kempler, Non-restricted Stock Option Plans: Kuchman and Lehman Cases, 16 Tax Law Rev. 339 (1961); Aidinoff, supra note 11, at 177; Comment, Taxation of the Stock Option as Intended Compensation, 9 UCLA Law Rev. 703 (1962); Sculley, Deferred Compensation in Stock Options, 41 Taxes 20; Browne, Capital Gains Opportunities For Employees, 20 NYU Inst.Fed.Tax. 103 (1962).

15. See § 421(e) (1) (2), 1954 Code; Treas.Reg. § 1.421–4(b)–(e); 1 Mertens, § 6.18 at pp. 76, 79. The record is silent as to why the capital gain privileges were not assured to these employees by appropriate continuation or assumption by the § 337 asset purchaser.

16. Taxpayer cites Commissioner v. Smith, 1945, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830; Helvering v. San Joaquin Fruit & Investment Co., 1936, 297 U.S. 496, 56 S. Ct. 569, 80 L.Ed. 824. See also Horwich, supra note 12; McNamara v. Commissioner, 7 Cir., 1954, 210 F.2d 505; Commissioner v. MacDonald, 7 Cir., 1957, 248 F.2d 552, discussed, Kempler, supra note 14, at 343; Commissioner v. Estate of Stone, 3 Cir., 1954, 210 F.2d 33; Union Chemical & Materials Corp. v. United States, 1961, 296 F.2d 221, 155 Ct.Cl. 540, severely criticized in Comment (U.C. L.A.L.Rev.), supra note 12, at 716, but see Horwich, supra note 12, at 604; Colton v. Williams, D.Ohio, 1962, 209 F. Supp. 381; 2 Mertens, § 11.11 and 1964 Cum.Supp. § 11.11.

17. § 1221, 1954 Code; § 117(a) (1), 1939 Code.

18. § 1222(3), 1954 Code; § 117(a) (4), 1939 Code. Taxpayer's brief asserts that this contention "accords with the long standing, congressionally recognized (S. Rep.No.1622, 83rd Cong., 2d Sess., 1954, 437) rule of the Internal Revenue Service set out in GCM 23677 (1943 Cum. Bull. 370):

> "In view of the foregoing it is the opinion of this office that the gain or loss arising from the sale of an option to acquire stock, to a person other than the owner of the stock subject to the option is a long-term capital gain or loss under the provisions of Section 117 (a) (4) and (5) of the Internal Revenue Code where the option has been held by the vendor of the option for more than six months. This opinion is limited, of course, to cases where the option is a capital asset within the meaning of Section 117(a)1."

And see 3B Mertens, § 22.29 n. 58 & 63.

of the Government here and below and the holding of the trial court, Commissioner v. LoBue, 1956, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142,[19] does not prevent capital gains treatment. This case, as did those following it,[20] held that it was the *transfer* of the *stock* to the employee for less than its full market value which conferred the benefit intended as compensation to the employee. Compensation, as such, must, of course, be taxed, but the compensation there involved was not in the grant of the option, but rather in the transfer of the stock pursuant to it. Upon a correct reading of such cases, the employer's intention to compensate was the purpose of transferring the stock. In no other way could the intention to compensate be made effective since the options themselves had no value.

Here, however—so the argument continues—no such purpose existed. The trial Court's finding that the stock options were compensation to the plaintiffs is unsupported, contradictory, and contrary to the stipulated facts. This is so because the Court also found the "options had no ascertainable market value at the time they were granted" (see note 10, supra), and it was stipulated by the parties that the purpose of the purchase of the options was to enable the Employer to eliminate the options and avoid these impediments to its liquidation within the required one-year period.[21] Additionally, the Trial Court's finding is wholly unacceptable because if the options themselves were compensation, the initial stock option plan could not have qualified as the statutory restricted stock option which it was and was stipulated to be.

And finally, so the argument runs, had Taxpayer exercised the option and acquired the stock, the stock would have been a capital asset in his hands. Under § 1234, as it then existed, capital gains would be acccorded when received from the sale of the underlying option.[22]

We think that in emphasizing the Employer's purpose as between compensating employees, on the one hand, and avoidance of impediments to a § 337 liquidation, on the other, Taxpayer confuses the *time* for determination of that purpose and the *value* of the option at any such moment. In other words, for the intention to compensate to be fulfilled, there must be *value*, so it is the time when demonstrable value exists that likewise measures intention. But the Court in LoBue did not begin even remotely to suggest that merely because the options, with their built-in restrictions, had no "ascertainable market value,"[23] the employer had no purpose to compensate the employees at the time the options were

---

19. The numerous articles referred to in notes 11, 12 and 14, as well as other texts, such as Mertens, §§ 6.18, 6.18c, 11.11, 21.80 and 22.29, trace the history culminating in LoBue and beyond. This includes discussion of the proprietary interest doctrine, the time that compensation is to be attributed to the employee, whether on grant of the option, its exercise, acquisition of the stock, etc., cases recognizing taxable value in the option itself, the effect of restrictions on the use of stock after exercise of the option, and the like.

20. Taxpayer makes the same criticism of Robert C. Enos, 31 T.C. 100, 1958; see also Charles E. Sorensen, 22 T.C. 321 (1954).

21. Taxpayer emphasizes especially the portion of the stipulated facts showing the Employer's purpose to be for its self protection, not compensation to the employees. See notes 6 to 8, supra, and accompanying text.

22. Prior to amendment by the Technical Amendments Act of 1958, P.L. 85–866, § 53, 72 Stat. 1606, § 1234 provided:
    "Gain or loss attributable to the sale of \* \* \* a privilege or option to buy or sell property which in the hands of the taxpayer constitutes (or if acquired would constitute) a capital asset shall be considered gain or loss from the sale or exchange of a capital asset; \* \* \*."

23. The above quotations are from Commissioner v. LoBue, 1955, 351 U.S. 243, 247–249, 76 S.Ct. 800, 803–804, 100 L.Ed. 1142.

granted. On the contrary, in rejecting application of the normal rule that a mere "purchase of property * * * at a bargain price" gives "rise to no taxable gain in the year of purchase,"[23] the Court described the option plan as "an arrangement by which an employer transferred valuable property to his employees in recognition of their services."[23] From the very outset, compensation was a significant, if not the only, purpose. It was the result of this arrangement that "LoBue received a very substantial economic and financial benefit from his employer prompted by the employer's desire to get better work from him."[23] In declaring that "When assets are transferred by an employer to an employee to secure better services they are plainly compensation,"[23] the Court did not ignore the option. Indeed, it was the arrangement by which the subsequent transfer came into reality. And it was not the less an operative fact because, by reason of the contingencies, the option itself then had no value.

The result is that Taxpayer's emphasis upon the Employer's purpose offers no help. Clearly, the stipulated facts demonstrate that the Employer's dominant motive in granting the options in 1952 was almost altogether a compensatory one. It was a way to make newly absorbed Danciger employees happy despite the loss of their former outside oil trading privileges. And as to others, it equalized stock acquisition rights among former employees. Since it was the purpose to *compensate* at the time the options were granted, it matters not what the motive was for putting an end to those options. The options being compensatory in purpose, either the option or the fruits of the option must be treated as compensation and taxed accordingly unless—and the unless is a big one—there is compliance with statutory procedures which ameliorate those tax consequences.

Application of these principles is fatal to the Taxpayer's appeal. There is, first, no doubt as a business-operative-fact that the payments made by the Employer in 1956 were the direct consequence of the existence of the option. It is further clear that the Employer looked upon these as perfectly valid obligations. The payments were in no sense an effort to compromise troublesome, doubtful claims or nuisance controversies. To the contrary, the payments represented an honest effort to give to the employee 100% of the value he would get had the stock been issued, held and then surrendered in the § 337 liquidation. In short, the money represented the net value of the stock after deducting the option price.

Of course ever since LoBue it has been unquestioned that, except for statutory alleviation, when a compensatory option has no ascertainable market value as of the time of grant, the receipt of fruits of the option when exercised, fixes the time and measures the value of the economic benefit intended to be, and now, conferred upon the employee. Thus under Commissioner v. Smith, 1945, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830, and LoBue, the value of the stock received by the exercise of the option was treated as ordinary income and subject to taxation as such.

And whatever the conceptual shortcomings might be to a theory which attributes to a right then having no ascertainable value the value of its fruits when and as they acquire demonstrable worth, it makes tax sense if not common sense, Steinhort v. Commissioner, 5 Cir., 1964, 335 F.2d 496, and in any event it makes congressional sense since Congress gave its imprimatur to this approach in the legislation enacted to ameliorate the consequences of the Supreme Court decisions. As all know, LoBue gave operative effect to the "uniform Treasury practice * * * to measure the compensation to

23. The above quotations are from Commissioner v. LoBue, 1955, 351 U.S. 243, 247–249, 76 S.Ct. 800, 803–804, 100 L.Ed. 1142.

**344**

employees given" contingent "stock options * * * by the difference between the option price and the market value of the shares at the time the option is exercised." 351 U.S. at 249, 76 S.Ct. at 804. True, Congress did not ordain that this would be the invariable consequence. But it did declare that if an employee to whom "a share of stock is transferred * * * pursuant to his exercise" of a stock option sought the preferential treatment of § 421(a) (1) which prescribes that "no income shall result at the time of the transfer of such share," it is necessary that the option first qualify as a "restricted stock option" and the stock not be disposed of within "six months after the transfer." § 421(a), (f).

All of this seems doubly sure when considered in the light of § 1234, so earnestly but unsuccessfully pressed by Taxpayer. And it is not enough, as does the Taxpayer on brief, to rely on § 1234 "as it then existed" on October 25, 1956, nor to question the validity of the September 25, 1957 regulations.[24] For the fact is that § 1234 was amended by the Technical Amendments Act of 1958 and made expressly retroactive to years prior to 1956.[25]

Equally important, the legislative history eliminates all doubt that the attention of Congress was once again focused on this highly complex, if not controversial, question of employee stock options. The Amendments first restructured the opening subparagraph to carry out the intent of the 1954 changes that "gain or loss attributable to an option to buy or sell property which would not be a capital asset in the hands of the taxpayer would result in ordinary income or loss rather than capital gain or loss."[26] Through the nonapplication section it then excluded the benefits of § 1234(a) in specific areas. In excluding from the benefits of § 1234(a) "any income derived in connection with such privilege or option which, without regard to this section, is treated as other than gain from the sale or exchange of a capital asset," (Par.(c) (2), note 25, supra) the committee reports spelled out the purpose to exclude employee compensatory stock options.[27]

---

24. See Treas.Reg. 1.1234–1(e) (1), in 1958 Federal Tax Regulations.

25. "Section 1234 OPTIONS TO BUY OR SELL.
"(a) *Treatment of gain or loss.—* Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, a privilege or option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option or privilege relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him).
"* * *
"(c) *Non-application of section.*—This section shall not apply to—
"(1) a privilege or option which constitutes property described in paragraph (1) of section 1221;
"(2) in the case of gain attributable to the sale or exchange of a privilege or option, any income derived in connection with such privilege or option which, without regard to this section, is treated as other than gain from the sale or exchange of a capital asset;
"* * * *; or
"(4) gain attributable to the sale or exchange of a privilege or option ac-

quired by the taxpayer before March 1, 1954, if in the hands of the taxpayer such privilege or option is a capital asset."
§ 1234, as amended by Technical Amendments Act of 1958, P.L. 85–866, § 53, 72 Stat. 1606. See § 1(c) (1), 72 Stat. 1606, which makes § 57 (§ 1234 of the Code as amended) apply to taxable years beginning after December 31, 1953, and ending after August 16, 1954.

26. S.Rep.No.1983, 85th Cong., 2d Sess., in 1958–3 U.S.Code, Cong. & Admin.News p. 4866. See 3B Mertens, § 22.29 1964 Cum.Supp. at p. 74 n. 63.

27. As to 1234(c) (2), the Senate Report stated:
"(2) It is made clear that the section does not apply to gains on the sale of an option in any case in which income derived in connection with the option would be treated, without regard to this section, as ordinary income. As a result, the section will not apply to gain from the sale of an employee stock option which is in the nature of compensation to the employee. It also will not apply to gain on the sale or exchange of an option involving 'section 306 stock' resulting in ordinary income and it will not apply

Additionally, subpar. (c)(2) is structured, not in terms of the "character" of the property—a capital or a non-capital asset as in subpar. (a). Rather, it is expressed in terms of "income derived in connection with such * * * option which, without regard" to § 1234 for purposes of taxation "is treated as other than gain from the sale * * * of a capital asset." When, to the express language of the committee report spelled out in plain terms of this immediate problem (see note 27, supra), there is added the structure which speaks in terms of tax consequences, not status of property, it becomes quite plain we think that the conflict between subpar. (c) (4) and (c) (2) is more apparent than real. It is inconceivable to us that Congress would extend under (c) (4) the benefit of § 1234 to pre-1954 compensatory employee stock options having no ascertainable market value, after denying benefits to them under (c) (2).

As we have earlier stated, we do not rule out the possibility that prefectly valid nonrestricted stock option plans can be effected which afford to employees the much sought after benefit of capital gains.[28] The Regulations whose validity we do not here examine, now specifically take cognizance of nonrestricted, nonqualifying stock options and undertake to distinguish tax consequences as to options having or not having a "readily ascertainable market value" at the time of grant.[29] But it would be making the silk purse out of the sow's ear, if not performing the alchemist's feat, Duncan v. United States, 5 Cir., 1957, 247 F.2d 845, 848, to attribute capital gain treatment to the proceeds received for the extinguishment of an option where the fruits of such option then legally obtainable, if received and translated into the same cash at that very moment, would have been treated as ordinary income. Whatever deficiencies there might be in the express terminology of the statutory mechanism for privileged stock options, we are satisfied that when these and the sections of the Code covering income and affording the preferred status of capital gain are matched together, no one could attribute to Congress any such incongruous result.[30]

Affirmed.

where a gain is a distribution of earnings and profits taxable as a dividend." S.Rep. 1983, supra note 26, at p. 4867.

And see Part IV Technical Explanation, at pp. 4995-6 as to subparagraph (2):

"Under this exception, for example, to the extent that gain on the sale or exchange of an option to purchase stock is in the nature of compensation to an employee, such gain is not to be treated as capital gain merely because the stock, if acquired, would be a capital asset in his hands." S.Rep. 1983, supra note 26, at p. 4996.

At least one commentator regards the technical explanation as "less alarming" than the "general explanation" which helped "to engender the concern" that "§ 53, Technical Amendments Act * * * was intended to reject out of hand capital gains treatment of the disposition of an option by adding section 1234(c) * * *." See Horwich, supra note 12, at 599 n. 20. The regulations make this distinction. Section 1.1234–1(e) (1) excludes gain from the benefits of § 1234 "to the extent that the gain is in the nature of compensation (see section 61 and

421, and the regulations thereunder, relating to employee stock options); * * *." See note 25, supra.

28. See note 12, supra.

29. See generally Treas.Reg. § 1.421–6 and particularly subpar. (a), (a) (3), (c), (d), (d) (2), and (f), as amended (1964). Of these Regulations, Bittker states:

"Unlike the 1946 regulation, the current provisions on 'non-statutory' stock options (as amended in 1961) acknowledged the possibility that income is recognizable when the option is granted, they also provide for situations in which the 'spread' at the time of the exercise cannot be computed because the employee cannot freely dispose of the stock." Bittker, supra, note 11, at 46. See Mullock, supra note 14, at 864; Aidinoff, supra note 11, at 176; Kempler, supra note 14, at 343; Comment (U.C. L.A.L.Rev.), supra note 12, at 714.

30. Taxpayer's alternative argument that the time of valuation was in 1952—the time of the grant—went out with LoBue. Even the dissent would not offer salvation for this contingent option.