**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**Irving GORDON and Margaret Gordon, Respondents.**

**Irving GORDON and Margaret Gordon, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 214, Docket 30572.**

United States Court of Appeals Second Circuit.

Argued Jan. 24, 1967.

Decided July 26, 1967.

Martin T. Goldblum, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen.; Lee A. Jackson, Gilbert E. Andrews, Washington, D. C., on the brief), for petitioner-respondent.

Harry R. Horrow, San Francisco, Cal. (Stephen J. Martin, Pillsbury, Madison & Sutro, San Francisco, Cal., on the brief), for respondents-petitioners.

Before MOORE and FRIENDLY, Circuit Judges; BRYAN,* District Judge.

MOORE, Circuit Judge.

The taxpayers, Irving and Margaret Gordon (husband and wife) in 1961 owned 1,540 shares of Pacific Telephone and Telegraph Company (Pacific) common stock. Their stock certificate represented a fractional part, in theory at least, of all the assets of this company. Although collectively the stockholders owned these assets, the corporate form was not within the control of the individual stockholder but, for all practical purposes, in the control of the company's management. Therefore, when Pacific decided to have its assets held by two corporations instead of one, the position of stockholders instead of one, the position of

* For the Southern District of New York, sitting by designation.

the Gordons remained unchanged. They merely needed to have another piece of paper to evidence their same fractional asset ownership. This, in substance, Pacific supplied. However as a result of the transaction, the Commissioner of Internal Revenue (the Commissioner) has assessed an income tax against the Gordons who properly ask, probably in some wonderment, how this corporate change of asset ownership brought income to them and, if so, where is it?

[1] Before considering the facts, which are not in dispute, the trite statement that an income tax should be a tax on income may serve as a beacon. All too frequently, Commissioners and courts launch into an analysis of tax sections, subsections, paragraphs and subparagraphs which practically exhaust the alphabet and Roman and Arabic numbers. In this intellectual exercise, the taxpayer often is only an incidental (though necessary) figure. Therefore, this review will be based on the principle that the ultimate question to be answered is: did the Gordons receive taxable income within the meaning of the Code because of their ownership of a Pacific stock certificate? It must be presumed that in enacting all the sections of the Code, relating to corporate changes, Congress adhered to the fundamental purpose of taxing income. The

Tax Court, 45 T.C. 71, has held that they did not as to 1,536 shares; the Commissioner appeals. As to four (4) stock rights sold, the Tax Court held that income resulted and the Gordons appeal. We affirm the Tax Court as to the Commissioner's appeal and reverse as to the Gordons' (taxpayers') appeal.

The principal question presented by this petition to review the decision of the Tax Court is whether the nonrecognition provisions of Section 355 of the Internal Revenue Code of 1954 can be applied to a spin-off by Pacific of a part of its assets. Pacific is a subsidiary of the American Telephone and Telegraph Company (AT&T which at all times owned over 80% of Pacific's common stock. Prior to July 1, 1961, Pacific provided the telephone services for California, Oregon, Washington and Idaho.[1] This is a rapidly growing area of the country and for purely business reasons, Pacific decided to divide the corporation. To this end a new corporation, Pacific Northwest Bell Telephone Company (Northwest), was formed to take over the non-California business of Pacific. Pacific's management studied a variety of methods by which to effect the division, one of which was a conventional spin-off which clearly would have qualified under Section 355.[2] This meth-

---

1. Pacific also provided telephone service in Nevada through a wholly-owned subsidiary which was not included in the spin-off here considered.

2. Section 355 of the Internal Revenue Code of 1954 reads as follows:

"§ 355. Distribution of stock and securities of a controlled corporation.

(a) Effect on distributees.—

(1) General rule.—If—

(A) a corporation (referred to in this section as the 'distributing corporation')—

(i) distributes to a shareholder, with respect to its stock, or

(ii) distributes to a security holder, in exchange for its securities, solely stock or securities of a corporation (referred to in this section as 'controlled corporation') which it controls immediately before the distribution,

(B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),

(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

(D) as part of the distribution, the distributing corporation distributes—

(i) all of the stock and securities in the controlled corporation held by it im-

od was rejected partly because of state law obstacles and, presumably, partly because the AT&T family filed a consolidated tax return which eliminated intercorporate dividends and thus qualification under Section 355 was not of great importance to the corporate management. It is, however, vital to the minority Pacific stockholders and to the taxpayers Gordon, who owned 1,540 shares of Pacific common stock. It is their position that regardless of what

mediately before the distribution, or

(ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c), and it is established to the satisfaction of the Secretary or his delegate that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax,

then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

(2) Non pro rata distribution, etc.— Paragraph (1) shall be applied without regard to the following:

(A) whether or not the distribution is pro rata with respect to all of the shareholders of the distributing corporation,

(B) whether or not the shareholder surrenders stock in the distributing corporation, and

(C) whether or not the distribution is in pursuance of a plan of reorganization (within the meaning of section 368(a) (1) (D)).

(3) Limitation.—Paragraph (1) shall not apply if—

(A) the principal amount of the securities in the controlled corporation which are received exceeds the principal amount of the securities which are surrendered in connection with such distribution, or

(B) securities in the controlled corporation are received and no securities are surrendered in connection with such distribution.

For purposes of this section (other than paragraph (1) (D) of this subsection) and so much of section 356 as relates to this section, stock of a controlled corporation acquired by the distributing corporation by reason of any transaction which occurs within 5 years of the distribution of such stock and in which gain or loss was recognized in whole or in part, shall not be treated as stock of such controlled corporation, but as other property.

(4) Cross Reference.—

For treatment of the distribution if any property is received which is not permitted to be received under this subsection (including an excess principal amount of securities received over securities surrendered), see section 356.

(b) Requirements as to Active Business.—

(1) In General.—Subsection (a) shall apply only if either—

(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, or

(B) immediately before the distribution, the distributing corporation had no assets other than stock or securities in the controlled corporations and each of the controlled corporations is engaged immediately after the distribution in the active conduct of a trade or business.

(2) Definition.—For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

(D) control of a corporation which (at the time of acquisition of control) was conducting such trade or business—

(i) was not acquired directly (or through one or more corporations) by another corporation within the period described in subparagraph (B), or

(ii) was so acquired by another corporation within such period, but such control was so acquired only by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions combined with acquisitions before the beginning of such period."

the Pacific management intended, the distribution should be given the preferred tax treatment provided by Section 355.

The plan ultimately agreed upon required Pacific to transfer to Northwest all of the non-California assets and liabilities plus $110,000 in cash in return for the issuance of 30,460,000 shares of Northwest common stock and an interest bearing demand note in the amount of $200,000,000. The result of these arrangements was to give Northwest a capital structure similar to that of Pacific. On June 30, 1961, Pacific ceased all non-California business. This Plan, which had been accepted by the Pacific shareholders in March of 1961, further required Pacific to offer to its shareholders the right to purchase *all* of the Northwest stock held by Pacific on a pro rata basis. It was left to the sole discretion of the Pacific management, however, to determine the number of offerings of Northwest stock to the Pacific shareholders and the price at which the stock would be made available. The Plan, nevertheless, made it clear that these decisions were to be made in response to the capital requirements of Pacific and it was anticipated that all of the Northwest stock would be distributed within three years. On September 20, 1961, Pacific issued one transferable stock right for each outstanding share of Pacific stock. Six such rights plus a payment of $16 were required to subscribe to one share of Northwest stock, which at this time had a fair market value of $26 per share. This initial distribution involved approximately 57% of the Northwest stock held by Pacific, an amount selected in order to pass control of Northwest to AT&T immediately following the first stage of the distribution. A second and final offering, the terms of which required eight rights plus $16 to obtain one share of Northwest stock, was made on June 12, 1963, of the remaining 43% of the stock.

Pacific adopted this more complex mechanism for distribution to enable it to satisfy simultaneously its very large requirements for additional capital to finance expansion. In each annual period prior to 1961, Pacific had been required to issue common stock or debentures in an average amount of nearly 200 million dollars per year. In the three years following 1961, however, these capital requirements were satisfied through the funds received from its distribution of Northwest stock and no common stock or debentures were issued.

In response to a request by Pacific, the Commissioner issued a ruling letter prior to the first offering which concluded that the sale of the rights would produce ordinary income and that their exercise would constitute a dividend under Section 301. He further stated that Section 355 would not be applicable.

This appeal involves only the tax year of 1961. The taxpayers exercised 1,536 of the 1,540 rights they received that year. On their income tax return, the taxpayers took the position that this aspect of the transaction was not subject to tax and therefore reported no gain or loss. The other four rights were sold for a total amount of $6.36, which was reported as a capital gain. On July 19, 1963, the Commissioner assessed a deficiency of $895.10 based on these transactions.

## I.

It is not disputed that the Pacific-Northwest corporate division fulfilled a valid business purpose. Nor is it disputed that the method selected by Pacific to accomplish this division was dictated by valid business reasons. In fact, it does not appear to be disputed that there was no possibility under this transaction for turning ordinary income into capital gains—the evil which Section 355 was designed to prevent. Rather, the government contends that in a number of technical respects, the requirements of that Section were not met and that, therefore, the distribution of Northwest stock must be treated as a dividend. While the government raises a number of purely technical questions to which we shall shortly turn, the truly

decisive question before this Court is how Section 355 shall be construed. The taxpayers argue that Section 355 is the embodiment of a Congressional decision that corporate divisions are desirable as a matter of public policy and should not be impeded by tax considerations. Congress recognized, of course, that corporate divisions are a perfect vehicle for bail-outs of earnings and profits and, therefore, hedged in the use of Section 355 with a number of conditions which must be met. But when the division presents no opportunity for a bail-out, these conditions should not be so construed as to frustrate the basic Congressional purpose. The Commissioner, for his part, argues that Section 355 is merely a tax concession granted by Congress to permit certain narrowly defined transactions. He concludes that, as with all such privileges, the statute is to be narrowly construed.

■ In evaluating the jurisprudential philosophy of the government, we are not required to limit our search to the instant case in which it serves the Commissioner's purpose to argue for a narrow construction. Initially, we note the long line of cases holding that mere compliance with the reorganization sections does not ensure a tax-free exchange if there is lacking a business purpose or, perhaps, a continuity of interest in the transaction. See. e. g., Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Bazley v. Commissioner of Internal Revenue, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782 (1947). While, obviously, the converse of this proposition is not true, these cases properly stand for the proposition that in de-

termining tax results, the courts do not merely look to the literal language of the statute but also view the business transaction as a whole in conjunction with the underlying purpose of the taxing statute. We are not aware of any rule of law that preserves such a salutary tenet of construction for the exclusive benefit of the Commissioner. See Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 86 L.Ed. 775 (1942).[3]

Furthermore, we note that the Commissioner has not always taken such a constricted view of the reorganization sections. When it serves his purpose, the Commissioner has argued that when a reorganization has in fact occurred, it should be taxed under the reorganization sections of the Code even though the strict requirements of the statute have not been met. See, e. g., Gallagher v. Commissioner, 39 T.C. 144 (1962); Berghash v. Commissioner, 43 T.C. 743 (1965), aff'd, 361 F.2d 257, (2 Cir. 1966).

While we think it beyond dispute that the courts are permitted a certain flexibility in applying the Code, it should be added that cases in which the courts must stray from the literal language of the Code in order to achieve its underlying objectives will not be frequent. Conversely, however, undermining the general purposes of the Code through an overly literal application of each of its technical provisions cannot be justified. Here it is evident that the taxpayers' investment remained in corporate solution (aside from the $6.36) and merely changed its form. The only additional factor was the payment of $16 per share which was in reality tantamount to a

---

3. In sustaining the contention of the taxpayer that a reorganization had occurred, the Court stated:

"Some contention, however, is made that this transaction did not meet the statutory standard because the properties acquired by the new corporation belonged at that time to the committee and not to the old corporation. That is true. Yet, the separate steps were integrated parts of a single scheme. Transitory phases of an arrangement frequently are disregarded under these sections of the revenue acts where they add nothing of substance to the completed affair. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355; Helvering v. Bashford, 302 U.S. 454, 58 S.Ct. 307, 82 L.Ed. 367. Here they were no more than intermediate procedural devices utilized to enable the new corporation to acquire all the assets of the old one pursuant to a single reorganization plan." 315 U.S. at 184–185, 62 S.Ct. at 544.

contribution to capital and that, of course, is no occasion for the imposition of a tax. Nor was there any opportunity for the taxpayers to use this transaction for a bail-out of earnings and profits. On the other hand, if the Commissioner prevails, taxpayers' equity investment will be turned into ordinary income.

Wholly aside from these considerations of a general nature, an examination of the specific objections made by the Commissioner reveals that at the maximum, this division strayed from the literal terms of Section 355 in only very minor respects.

### A. "Distributes * * * with respect to its stock."

From the taxpayers' point of view, they found themselves holding two pieces of paper, a certificate for 1,540 shares of Pacific, and a certificate for 1,540 rights, which when exercised, together represented their ownership in Pacific's assets, including a $16 capital contribution, certainly not an income-producing act. They were neither richer nor poorer. Neither the receipt of the rights certificate and its exercise nor the capital contribution produced any income to them. The Tax Court quite properly observed that

> "If Congress had intended that a distribution of the Northwest stock be treated as tax-free when made without consideration, it is inconceivable that it could have intended the transaction to result in taxable income to the distributees where they *paid out* money in connection with receiving such stock." (Emphasis in original.) 45 T.C. 71.

█ Subsection (a) (1) (A) (i) requires that the stock of Northwest be distributed by Pacific with respect to the Pacific stock. The Commissioner argues that in fact Pacific distributed only stock rights with respect to its stock and that the Northwest stock was exchanged for six rights, which could have

been purchased through the market by anyone and $16 and, thus, qualification under Section 355 is barred because a distribution of stock rights does not satisfy the statute. We think the result contended for by the Commissioner is precluded by Palmer v. Commissioner of Internal Revenue, 302 U.S. 63, 58 S.Ct. 67, 82 L.Ed. 50 (1937) and Choate v. Commissioner of Internal Revenue, 129 F.2d 684 (2 Cir. 1942). Normally, the distribution of a stock right has no tax consequences because there is no distribution of corporate property until the right is exercised.[4] A sale or exchange of a stock right prior to exercise results in a tax only because it is an anticipation of gain from an exercise. It follows in this case that it is the actual distribution of the Northwest stock upon the exercise of the rights that is the relevant event and the use of the stock rights as a mere mechanism to accomplish this result should be disregarded. Compare Kimbell-Diamond Milling Co. v. Commissioner, 14 T.C. 74 (1950), aff'd, 187 F.2d 718 (5 Cir. 1951); Heller v. Commissioner, 2 T.C. 371 (1943), aff'd, 147 F.2d 376 (9 Cir. 1945).

Secondly, the Commissioner argues that the phrase "distribution * * * with respect to its stock" is a term of art that excludes the use of a cash consideration such as the $16 required here. He cites no authority for this proposition and we are aware of none. It is perfectly obvious that the Code does not contemplate the receipt of cash by a corporation in connection with a distribution with respect to its stock in the sense that some specific section of the Code spells out the tax result. See Sections 311(a) and 312(d). But it scarcely follows that the Code prohibits the receipt of cash or that if the instant transaction is classified as falling within Section 355, the tax consequences cannot be determined. The only additional factor present is the payment of the $16 and that can be treated very simply as a con-

---

4. Possible exceptions such as Section 305(b) have no application to the instant transaction.

tribution to capital by a shareholder. However, this question is not before us.[5]

■ The ultimate question before us is whether, when a reorganization is coupled with another transaction, these two transactions can, or should, be re-separated for federal income tax purposes. When it suits the Commissioner's convenience, he has so argued. See, e. g., Rev.Rul. 61–156, 1961–2 C.B. 62; Regulations 1.301–1(e) and 1.331–1(c). And if the Code is to conform as closely as possible to economic reality, such a division should be performed when necessary. Of course, if the coupling itself is promotive of the evils which the taxing statute was designed to prevent, a separation for tax purposes should not be made for then the taxpayers would have obtained the best of all possible results to the prejudice of the fisc. Here the Tax Court concluded that no conceivable purpose would be served by denying tax-relief when the taxpayer paid out cash while such relief was granted absent this expense. The Commissioner answers the Tax Court by arguing that the use of transferable stock rights plus the $16 requirement "predictably will diminish the continuity of ownership." Thus the Commissioner invokes the judicial gloss on the reorganization sections that, with some exceptions, continuity of interest must be maintained. The short answer to this argument is that it was. The doctrine of continuity of interest has never to our knowledge been used to void a reorganization on the ground that some shareholders might have sold their stock. Indeed, such a rule would void each and every attempted reorganization for with rare exceptions, stock can always be sold as Congress expressly permitted in Section 355(a)

(1) (B). Rather, this limitation is applied to the actual result of a transaction: was a continuity of interest in fact maintained? Here over 95% of the shareholders in Pacific before 1961 exercised their rights and became shareholders in Northwest. Further, AT&T itself owned over 80% of the Pacific stock and after the division owned over 80% ,of both Pacific and Northwest. The doctrine of continuity of interest asks no more.[6]

B. *"Transaction in which gain or loss was recognized."*

■ The Commissioner further takes the position that qualification under Section 355 is barred by the requirement of Section 355(b) (2) (C) that the trade or business which is being actively conducted by either the controlled or the distributing corporation was not acquired in a transaction in which gain or loss was recognized. Taxpayers argue and the Tax Court agreed that because any gain or loss on the intercorporate transaction was eliminated on the consolidated tax return of these affiliated corporations, this condition of the Section was satisfied. Analysis of the purposes underlying subsections (b) (2) (C) and (D) prohibits acceptance of this conclusion because the happenstance of affiliation does not remove the danger of purchasing a corporation for the purpose of distributing its stock as a dividend while avoiding the tax on dividends. However, this same analysis of the statute indicates clearly, we think, that 355(b) (2) (C) has no application to this case. The theory underlying 355(b), the active business requirement, is the prevention of the temporary investment of liquid assets in a new business in preparation for a 355(a) division. The primary dan-

---

5. Although Pacific appears to have treated the cash obtained from the minority stockholders as gain from the sale of property, that is no bar to these taxpayers.

6. In Commissioner of Internal Revenue v. Baan, 382 F.2d 485 (9 Cir. 1967), which arose out of the same corporate division and was decided by the Tax Court with the instant case, it was held that the re-

quirements of Section 355 had not been met. One of the principal grounds of that decision was that while the mere use of stock rights may not preclude a tax-free division, the added condition of a $16 payment barred the application of Section 355 because of the danger that a continuity of interest would not be maintained.

ger envisioned by the draftsmen of this Section was the creation of the new business and the safeguard was the five-year provision. The reasoning is that if the new business must be operated for at least five years, there will be little incentive to use this device for tax avoidance purposes. The second danger was that instead of creating a new business, the corporation would purchase one which had been in existence for over five years and then distribute its stock in place of a dividend. To safeguard against this possibility, subsections (b) (2) (C) and (D) prohibit acquisition of a trade or business, or of a corporation, in a transaction in which gain or loss was recognized. In our case no new business, no new assets and no new corporation was acquired at all. No liquid assets were temporarily invested nor, in fact, was there any temporary investment. Consequently, the application of these sections to the instant transaction would serve no purpose at all. We think that the draftsmen of Section 355 intended these subsections to apply only to the bringing of new assets within the combined corporate shells of the distributing and the controlled corporations. Therefore, it is irrelevant in this case whether gain was recognized on the intercorporate transfer.

### C. *Single Distribution.*

Finally, the Commissioner argues that there is an implied requirement in Section 355 that the distribution of stock take place in a single offering and since Pacific utilized two offerings separated by almost two years, the statutory requirement has not been met. It is conceded that there is no direct authority for this proposition but the Commissioner argues that such a result is demanded by the scheme of Section 355. In particular, he refers to subsection (a) (1) (D) which reads as follows:

(D) as part of the distribution, the distributing corporation distributes—
(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or

(ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c), and it is established to the satisfaction of the Secretary or his delegate that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax,

\* \* \* \* \* \*

■ On its face, this subsection is simply the embodiment of the Congressional decision that only complete, and not partial, divisions were to receive tax-free status and its purpose seems limited to establishing the amount of stock which must be distributed for qualification under Section 355. Both subdivisions require that the distributing corporation distribute an amount of stock in the controlled corporation constituting control. Subdivision (D) (i) imposes the additional requirement that the distributing corporation distribute all of the stock held "immediately before" the distribution to its shareholders, even if that amount is less than all of the outstanding stock. The quoted language in no way requires a single distribution but is merely the means used to permit distribution of less than all of the outstanding stock in the controlled corporation. Alternatively, the corporation may proceed under (D) (ii) which permits retention of stock to a limited degree. Permitting retention at all is a departure from prior law and from the Congressional policy of complete division at the corporate level. To prevent abuse, Congress added to this subdivision a requirement that the taxpayer affirmatively demonstrate the absence of tax avoidance objectives instead of requiring the Commissioner to move under subsection (a) (1) (B). Here again, the fact that Congress permitted limited retention after the completion of the distribution cannot be said to imply that the distribu-

tion must have but a single phase. Thus there is nothing on the face of this subsection that relates to the number of transactions, or their timing, which may be contained in a distribution. These matters are entirely governed by the more flexible "device" clause of Section 355(a) (1) (B) which is fully adequate for this purpose and which clearly is no bar to the qualification of this corporate division. As there is no dispute that in both the original plan and in the fact a complete division occurred, applying the statute in this, the most obvious, manner and giving its words their everyday import compel the conclusion that subsection (a) (1) (D) was satisfied.

The Commissioner, however, contends that the requirements of subsection (a) (1) (D) "undoubtedly" were designed to prevent periodic distributions of stock in the controlled corporation as a substitute for dividends. The only authority for this proposition is Professor Bittker who, in discussing the requirement of explaining retention to the Secretary, "presumes" this purpose. But Professor Bittker was not addressing himself to the question of a single distribution and the Commissioner omits to cite his further observation in the same paragraph that such an abuse would clearly be prohibited by subsection 355(a) (1) (B), the "device" clause, and thus if that is the purpose of the subsection, it is redundant. He further notes that there does not appear to be any necessity for the provision in any event. Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 479 (2 Ed. 1966). Another commentator states that the requirement of subsection (a) (1) (D) "is designed to differentiate between genuine separations and incidental distributions of a controlled corporation's stock which take the place of current cash dividends." Surrey & Warren, Federal Income Taxation 1640

(1962). The Commissioner does not suggest that the instant transaction was not a genuine division nor could it conceivably be considered a substitute for a current dividend.

Whether a corporation has retained stock or distributed it is simply a question of the point in time that the manipulation is examined. The Commissioner argues that this point is immediately after the first transaction and that subsection (a) (1) (D) (ii) prohibits "retaining" over 20% of the stock after this point. The taxpayers argue that the time is after the culmination of the plan of distribution and that subsection (a) (1) (D) (ii) only prohibits an indefinite retention.[7] On its face Section 355 gives little guidance but we do know that neither of the purposes suggested for subsection (a) (1) (D) will be defeated by permitting more than one distribution and that the construction of that provision for which the Commissioner argues does not fit easily within its language. But an adequate restriction is already provided by subsection (a) (1) (B).

Further, the incongruity of the result urged by the Commissioner when viewed against other provisions of the Code creates considerable doubt that Congress would intentionally require a single distribution. In 1961 Pacific was the eighth largest non-financial company in the United States and had over 38,000 shareholders. The reorganization resulted in a distribution of over 30 million shares of Northwest stock and raised for Pacific nearly one-half billion dollars. A requirement that such a transaction occur on a single day would be staggering. As far as this Court is aware, none of the other reorganization sections impose such a requirement, aside from the highly limited scope of Bausch & Lomb Optical Co. v. Commissioner of Internal Revenue, 267 F.2d 75 (2 Cir. 1959), which is not relevant here. Regulations

---

**7.** While the Plan adopted by Pacific theoretically might have permitted this, the surrounding facts make it certain, as found below, that long-term retention was never intended and, of course, was not the fact. In the future, it would be preferable that such plans set out the timetable of distribution more precisely, as undoubtedly the Commissioner will require.

1.368–2(c); Rev.Rul. 58–93, 1958–1 C.B. 188. See also Sections 332(b) and 337 (a).

As it is fairly apparent that neither the Code nor the Regulations require, at least by their terms, a single distribution, such a requirement cannot be read into the Code, at least without a substantial reason. A fair reading of the Commissioner's brief indicates that he fears two problems from the result reached below. First, he suggests the danger of periodic distributions as a substitute for dividends and the tax avoidance that this would permit. But as we have noted, it is not clear that there are tax avoidance possibilities in such a scheme so long as the active business requirements are met; if they could be shown to exist, the "device" clause would prohibit any bail-out.

Second, the Commissioner points to a number of administrative difficulties inherent in permitting more than a single distribution such as leaving open the tax result for several years, the problem of defining the "date of distribution," and the difficulty in ascertaining whether there was control "immediately before" the distribution.[8] But the facts of this case can hardly be said to create the insurmountable administrative difficulties which the Commissioner has paraded before us in his brief. Here only two transactions occurred covering a maximum of three tax years. In fact, the deficiency notice in this case was not sent until July of 1963, two months after the second distribution was authorized. The Commissioner attacks the Tax Court by asserting that its opinion would permit ten distributions of 10% of the Northwest stock, an assertion most doubtful in itself for it overlooks the impact of subsection (a) (1) (B). But that is not our case and it can scarcely be contested that the Code imposes a tax on facts, not expectations. Perhaps the enormity of the administrative difficulties may be measured in part by the failure of the Commissioner to raise the single distribution point in the Tax Court.[9]

Conceding that some administrative problems will arise from our decision, they hardly provide a justification for denying tax-free reorganization status to a legitimate spin-off that entails none of the tax avoidance features that Section 355 was designed to prevent. In any event, we think it is the task of the Commissioner to resolve these difficulties, not the courts'. Nothing in our opinion prevents the Commissioner from drafting reasonable Regulations limiting the time period within which the entire distribution must be made, or the number of transactions which may be involved, or specifying what advance notice must be provided the Service, or defining the statutory language quoted above. But we are not prepared to apply retrospectively restrictions directed at evils which this case does not present.

The decision of the Tax Court on the Commissioner's petition is affirmed.

## II.

Four of the stock rights issued by Pacific were sold by taxpayers for a total amount of $6.36. The Tax Court determined that aside from the effect of Section 355, this distribution by Pacific would be taxable as a dividend. The

---

8. The fact that the two transactions which we hold constituted a single distribution occurred in different tax years is of no significance. Had the transactions occurred in January and December of 1961, we would be faced with the same questions as this case presents. The Commissioner makes no point of the fact that two tax years are involved, nor could he. See Pridemark, Inc. v. Commissioner of Internal Revenue, 345 F.2d 35 (4 Cir. 1965).

9. In Commissioner of Internal Revenue v. Baan, supra, the Ninth Circuit alternatively held that while a single distribution was not required by subsection (a) (1) (D), because of the difficulties in administration, "such distributions must not extend over any greater period of time than is reasonably necessary considering the practical problems involved in completing such distributions." While this approach effectively compromises the harshness of the Commissioner's argument, the statute contains no such requirement.

Court further held that Section 355 could have no application until there had actually been a distribution of stock and, thus, where the rights were disposed of prior to exercise, Section 355 had no application. Such an asymmetrical approach to Section 355 is untenable.

 It is well settled that the exercise of a stock right may result in dividend income if the fair market value of the acquired stock exceeds the option price. Palmer v. Commissioner of Internal Revenue, 302 U.S. 63, 58 S.Ct. 67, 82 L.Ed. 50 (1937); Choate v. Commissioner of Internal Revenue, 129 F.2d 684 (2 Cir. 1942). And since the sale of a right may be an anticipatory realization of dividend income, gain on the sale is similarly taxed at ordinary income rates. Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940); Gibson v. Commissioner of Internal Revenue, 133 F.2d 308 (2 Cir. 1943). However, in a transaction to which Section 355 applies, the distribution of stock by a corporation does not result in a dividend even though the distribution was accomplished by the use of stock rights and the option price was less than the fair market value of the acquired stock. The assumption of such cases as *Palmer* and *Gibson* is that a distribution of corporate earnings results from the existence of a "spread." Section 355, on the other hand, is a statutory device for determining that a distribution of capital, rather than of earnings, has occurred and therefore the assumption of those cases is inapplicable. The reasoning of *Gibson*, however, that the sale of a stock right should be taxed the same as an exercise, is controlling. Similar reasoning exists in Code Section 1234(a). And see Rank v. United States, 345 F.2d 337 (5 Cir. 1965). Since the gain on an exercise of these rights, although deferred until the sale of the stock, would be capital, we hold that the sale of the rights simi-larly gave rise to capital gains. The error of the Tax Court was in forgetting that it is not the individual shares of stock received by these taxpayers that qualify under Section 355 but the entire distribution by Pacific.

The decision of the Tax Court on the taxpayers' petition is reversed.

FRIENDLY, Circuit Judge (dissenting).

If in 1962 a revenue agent had reviewed the Gordons' 1961 return which, as stipulated, "did not include as income any amount with respect to the sale of rights to purchase Northwest stock or with respect to the exercise of rights to purchase Northwest stock or with respect to the receipt of such stock," he would have been justified in thinking his task was an easy one, at least so far as concerns the point here decided in favor of the taxpayers. Tender of six such rights plus $16 permitted the purchase of a share of Northwest stock at well below market price.[1] Despite the majority's belief that stockholders realize no income simply because of the receipt of "another piece of paper to evidence their same fractional ownership," Palmer v. C. I. R., 302 U.S. 63, 58 S.Ct. 67, 82 L.Ed. 50 (1937), as interpreted by this court in Choate v. C. I. R., 129 F.2d 684 (2 Cir. 1942), taught that the sale or exercise of the Pacific rights was dividend income unless some section of the 1954 Internal Revenue Code dictated otherwise. Examining § 355, the section held by my brothers to afford a tax shelter, the agent would have encountered subdivision (a) (1) (D), which requires that:

"as part of the distribution, the distributing corporation distributes—

(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or

---

1. During the offering period the price of the Northwest shares ranged from $28.25 to $25.25. In determining the value of the rights and consequent dividend income the Commissioner used $26, the average price on October 5, 1961, the day the Gordons exercised their warrants. Taxpayers make no claim that the value of the rights on the day of receipt was less than the amount thus determined.

(ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368 (c), and it is established to the satisfaction of the Secretary or his delegate that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax."

He would readily have ascertained that Pacific had not met the test of clause (i) since, far from having distributed all the Northwest stock "held by it immediately before the distribution," it retained 13,013,969, approximately 43% of the total of 30,460,000 shares.

By the same token Pacific had not complied with clause (ii); the 57% of the stock distributed was nowhere near the 80% "constituting control within the meaning of section 368(c)." If Mr. Gordon had displayed Pacific's letter of February 27, 1961, requesting stockholder assent to the plan and advising "It is expected that within about three years after acquiring the stock of the New Company [Northwest], the Company [Pacific] by one or more offerings will offer for sale the balance of such stock, following the procedure described in the preceding paragraph," the agent could have replied that § 355 is concerned with acts rather than expectations. He might also have repeated Mr. Justice Stone's oft-quoted statement, as true today as when written: "All the revenue acts which have been enacted since the adoption of the Sixteenth Amendment have uniformly assessed the tax on the basis of annual returns showing the net result of all the taxpayer's transactions during a fixed accounting period, either the calendar year, or, at the option of the taxpayer, the particular fiscal year which he may adopt." Burnet v. Sanford & Brooks Co., 282 U.S. 359, 363, 51 S.Ct. 150, 151, 75 L.Ed. 383 (1931). The agent would therefore have been obliged to recommend the determination of a deficiency, so far at least as § 355 was the basis asserted for the taxpayers' return,

and this without even having to consider the Commissioner's basic claim, recently sustained by the Ninth Circuit, C. I. R. v. Baan, 382 F.2d 485 (1967), that a distribution of rights to purchase the stock of a controlled subsidiary at less than its fair value is not within § 355 (a) (1) (A).

If a court would have sustained the agent in litigation during 1962, as it seemingly would have had to do, I fail to perceive how Pacific's action in ridding itself of the remaining Northwest shares in 1963 can justify a different result. The 1961 taxes of the Gordons and other minority stockholders depend on what Pacific did in 1961, not on what it chose to do in 1963. Burnet v. Sanford & Brooks Co., supra; see also Healy v. C. I. R., 345 U.S. 278, 281, 73 S.Ct. 671, 97 L.Ed. 1007 (1953). When Congress has meant the events of one year to affect the tax for another, it has said so in language all can understand. See, e. g., §§ 172(b), 381, 382, 1301, 1302, 1303. Although the plan adopted by Pacific in 1961 committed it to offer its shareholders "the right to purchase all of the shares of capital stock of the New Company," the plan also provided, subject to an exception not here material, that "the number of shares to be offered to the shareholders of the Pacific Company in any one offering, the number of offerings to be made, and the price at which said shares shall be offered to the shareholders of the Pacific Company shall be determined by the Board of Directors of the Pacific Company in its sole discretion." The qualification was so broad as to deprive the commitment of legal significance, and while in fact the second distribution occurred within 21 months, it is not difficult to think of circumstances, such as adverse regulatory action or restrictions on the procurement of telephone plant due to national emergency, that might have postponed Pacific's need for funds and consequent further distribution of Northwest stock for many years. Moreover, if the 1961 distribution of some 57% of the stock can be metamorphosed into a distribution of

100% by what occurred two years later, I assume my brothers would also give the 1963 distribution of 43%, which clearly would not qualify on its own since Northwest was not then a "controlled corporation" within § 355(a) (1) (A), see § 368(c), the color now attributed to its predecessor. Furthermore, under my brothers' view that a corporation satisfies § 355(a) (1) (D) if it ultimately rids itself of all the stock of the controlled corporation, the shelter of § 355 would extend to a 1961 Pacific stockholder who sold his stock before 1963 and to a 1963 stockholder who had not owned Pacific stock in 1961. How this jibes with the recognized purpose of § 355 to give tax-free treatment where there is "a continuity of the entire business enterprise under modified corporate forms and a continuity of interest in all or part of such business enterprise on the part of those persons who, directly or indirectly, were the owners of the enterprise prior to the distribution," Regulations § 1.355–2(c), passes my understanding.

The inspiration for the magic whereby two distributions of 57% and 43% in different years become one of 100% is my brothers' belief that at the end of the process the position of most Pacific stockholders with respect to Northwest shares they had acquired had changed only in their having paid $16 per share to retain what they had owned all along, a feeling—which I share—that the instant transaction was motivated by business considerations and not by a desire for tax avoidance, and an apparent view that § 355(a) (1) (D) was an unnecessary or at least a redundant requirement. Yet the stockholders' investment status would also have been unchanged and the Company's motive equally pure if Pacific had never made the second distribution or if Northwest had been only 79% owned from the outset, and, despite the majority's apparent distaste for the view that distribution of rights to purchase corporate property below market value normally constitutes a dividend, I cannot imagine any court would consider that in such event rights offerings like those here made by Pacific were protected by § 355.

Congress has simply not seen fit to exempt all distributions where stockholders' investments remain unchanged from a practical standpoint and no tax avoidance motive is manifest; instead it has chosen to lay down extremely specific conditions which a corporation must follow at its peril if it desires to achieve nonrecognition for its stockholders. Complicated tax statutes particularly invite application of Mr. Justice Holmes' precept, "Men must turn square corners when they deal with the Government," Rock Island, Ark. & La. R. R. v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920). In § 355 (a) (1) (D) Congress elected to convert a vague guideline contained in the Regulations under the 1939 Code that "Ordinarily, the business reasons (as distinguished from any desire to make a distribution of earnings and profits to the shareholders) which support the reorganization and the distribution of the stock will require the distribution of all of the stock received by the transferor corporation in the reorganization," Regs. § 39.112(b) (11)–2(c), into a specific statutory requirement: Distribute all at once with no questions asked, or, if you prefer, distribute not less than 80% of the stock of the controlled corporation and satisfy the Commissioner that any retention was not for a forbidden purpose. When Pacific chose not to comply for what it considered valid business reasons, its stockholders must take the conequences.

The Supreme Court has pertinently instructed us to approach revenue acts with the attitude that "the plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover." Old Colony R. R. v. C. I. R., 284 U.S. 552, 560, 52 S.Ct. 211, 213, 76 L.Ed. 484 (1932), citing Lynch v. Alworth-Stephens Co.,

267 U.S. 364, 370, 45 S.Ct. 274, 69 L.Ed. 660 (1925). It has also told us that "the words of statutes—including revenue acts—should be interpreted where possible in their ordinary, everyday senses," Crane v. C. I. R., 331 U.S. 1, 6, 67 S.Ct. 1047, 1051, 91 L.Ed. 1301 (1947); Hanover Bank v. C. I. R., 369 U.S. 672, 687, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962). A requirement that a corporation distribute all of a controlled corporation's stock held by it "immediately before the distribution," when read against the basic concept of annual tax accounting, can only mean to distribute all at one time [2]—not to distribute 53% and plan to distribute the rest in a later year or years when and as that suited.[3] With all respect, my brothers seem to be emulating Humpty Dumpty when they say that the words of the statute in "their everyday import" authorize such a course,[4] and that the only basis for believing the words mean what they say is the view of a distinguished professor, now endorsed by another court of appeals, who, while thinking that Congress could have been more liberal without seriously affecting the revenue, recognized that "Whatever the validity of the reasons for its existence, § 355(a) (1) (D) must of course be complied with." Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders § 11.07 at 479 (1966). And we do not satisfactorily answer the Commissioner's claim of administrative difficulties by chiding him for failure to have promulgated regulations that would partially seal up the breach in the statute we are attempting to create today. Unless the words used by Congress lead to absurd results, are inconsistent with its apparent purpose, or are filled by history with a meaning different from the ordinary one, none of which can be successfully asserted here, a court's job is to apply what Congress has said.

Since I am in full accord with the Ninth Circuit that Pacific's decision to bypass the requirement of § 355(a) (1) (D) prevents § 355 from immunizing the income realized on the exercise of the rights,[5] I find it unnecessary to decide whether that court or the instant majority is right as to the transaction's meeting the basic test, § 355(a) (1) (A), of being a distribution solely of stock or securities of a controlled corporation with respect to stock of the distributing corporation. Certainly the words have an uneasy fit to the transaction here in question. What Pacific distributed "with respect to its stock" was not "solely stock or securities" of a controlled corporation but rights to purchase such stock below market price, and the stock of the controlled corporation was distributed "with respect to" the rights rather than the Pacific stock. But even if the distribution of Northwest stock qualified under § 355, I could not agree to reversal of the Tax Court's

---

2. It is setting up a straw man to suggest that this means that the mechanics of a large distribution must be fulfilled "in a single day."

3. There is the further point, noted in Judge Hamley's able opinion in Baan, supra, 382 F.2d 485, 498 n. 22, that the concept of *seriatim* distributions might often be inconsistent with the requirement of § 355(b) (1) (A) and (2) (B) that the distributing and controlled corporations shall have actively conducted a trade or business "throughout the 5-year period ending on the date of such distribution."

4. This comment applies also to such statements as that "The quoted language in no way requires a single distribution," that "there is nothing on the face of this subsection that relates to the number of transactions, or their timing, which may be contained in a distribution," and that "it is fairly apparent that neither the Code nor the Regulations require, at least by their terms, a single distribution."

5. Taxpayers' arguments based on decisions under predecessors of § 351(a) are answered in the opinion in Baan, supra, 382 F.2d at 492.

**514**

decision that the proceeds of the sale of rights to purchase Northwest stock constituted ordinary income. Palmer v. C. I. R., supra, along with Choate v. C. I. R., 129 F.2d 684 (2 Cir. 1942), and Gibson v. C. I. R., 133 F.2d 308 (2 Cir. 1943), instruct us that the value of the rights on receipt would be taxable as ordinary income upon their exercise or sale but for some exemptive provision in the Code. Vaulting the language barriers that seem to prevent the issuance of Northwest stock on the exercise of rights from coming within § 355, would not help Pacific's stockholders as to rights they sold. As Judge Raum correctly said, the argument "fails to take into account the nature of Section 355, which is a nonrecognition provision, and can be utilized only by those shareholders who come within its terms"— namely, on the majority's view, shareholders who received a distribution of Northwest stock "in respect of" their Pacific stock. The majority's references to § 1234 and to Rank v. United States, 345 F.2d 337 (5 Cir. 1965), are inapposite; what is here sought to be taxed is the initial value of the rights, not a gain on their sale. Taxpayers argue that the Tax Court's holding creates an unjustifiable distinction between a stockholder who sells rights to purchase stock of a controlled corporation and one who sells the stock of the latter on a when-issued basis and exercises rights to cover the sale. But "the Commissioner is justified in determining the tax effects of transactions on the basis in which taxpayers have molded them," Television Industries, Inc. v. C. I. R., 284 F.2d 322, 325 (2 Cir. 1960). Moreover, the actual answer may well be that, for reasons heretofore noted, neither the real nor the hypothetical taxpayer is entitled to the benefit of § 355.

On the Commissioner's appeal I would reverse the decision as to § 355 and remand for consideration of the other grounds advanced by the taxpayers and not dealt with by the Tax Court; on the taxpayers' appeal I would affirm.