115 T.C. No. 18

UNITED STATES TAX COURT

DOUGLAS P. MCLAULIN, JR., ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 7832-98, 7833-98,   Filed September 20, 2000.
            7834-98.

        Ps' "S corporation", A, owned 50 percent of the
stock of corporation B, a "C corporation".  B redeemed
individual H's 50-percent stock interest in B for cash
and real property.  On the previous day, B had borrowed
from A an amount exceeding the cash consideration and
representing over 96 percent of the total consideration
paid to H for his stock.  On the same day as the
redemption, A distributed its then 100-percent stock
interest in B to Ps in a transaction intended to
qualify as a tax-free spinoff under sec. 355(a)(1) and
(c)(1), I.R.C.

        Held:  Because A's distribution of the stock of B
occurred less than 5 years after A acquired control of

    [1]    Cases of the following petitioners are consolidated
herewith:  Augustus H. King III, docket No. 7833-98, and
Alfred E. and Lynn B. Holland, docket No. 7834-98.

B in a transaction in which gain or loss was recognized, the distribution failed to satisfy the active business requirement of sec. 355(a)(1)(C) and (b)(2)(D)(ii), I.R.C.  The distribution resulted in gain to A under sec. 311(b), I.R.C., taxable to P's under sec. 1366(a), I.R.C.

Robert J. Beckham, Donald W. Wallis, and Suzanne M. Judas, for petitioners.

William R. McCants, for respondent.

HALPERN, Judge:  These consolidated cases involve the following determinations by respondent of deficiencies in petitioners' Federal income taxes for 1993:

| Petitioner | Deficiency |
|---|---|
| Douglas P. McLaulin, Jr. | $97,244 |
| Augustus H. King III | 97,124 |
| Alfred E. & Lynn B. Holland | 97,244 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Petitioners bear the burden of proof.  See Rule 142(a).

After concessions, the only issue for decision is whether the January 15, 1993, distribution by Ridge Pallets, Inc., a Florida corporation (Ridge), of all of the outstanding stock of Sunbelt Forest Products, Inc., also a Florida corporation (Sunbelt), qualifies as a tax-free "spinoff" of Sunbelt to

petitioners, the sole shareholders of Ridge, pursuant to section 355. We hold that it does not. Our reasons follow.

FINDINGS OF FACT

Introduction

Some facts have been stipulated and are so found. The stipulation of facts filed by the parties, with attached exhibits, is incorporated by reference.

At the time the petitions were filed, petitioner Douglas P. McLaulin, Jr. (McLaulin) resided in Mulberry, Florida, petitioner Augustus H. King III (King) resided in Lakeland, Florida, and petitioners Alfred E. and Lynn B. Holland (Holland, when referring to Alfred) resided in Bartow, Florida.

Ridge and Sunbelt

Ridge was incorporated in 1959 by Richard B. Craney (Craney). From 1977 until July 25, 1993, the sole, equal shareholders of Ridge were McLaulin, King (Craney's stepson), and Holland. Ridge was engaged in the forest products business. Ridge was profitable, with more than $13 million in retained earnings as of July 25, 1993.

On December 31, 1986, Ridge elected to become an S corporation as that term is defined by section 1361(a)(1) (S corporation), effective for its taxable year ended July 25, 1988. Ridge qualified as an S corporation for each taxable year thereafter, through and including its taxable year ended July 25, 1994.

Sunbelt was incorporated in 1981.[2]  Initially, its sole, equal shareholders were Craney, Ridge, and an otherwise unrelated individual, John L. Hutto (Hutto).  In 1986, Craney's shares of stock were redeemed by Sunbelt, and, from then until January 15, 1993, Ridge and Hutto were the sole, equal shareholders of Sunbelt.  Hutto was president of Sunbelt and chairman of its board of directors.  He was responsible for all executive functions of Sunbelt.  Sunbelt produced and sold pressure-treated lumber.  That business was profitable.  In February 1989, based on Hutto's experience in the millwork business (manufacturing doors and window frames), Sunbelt entered the millwork business (the millwork division).  The millwork division lost money from its inception to its shutdown in mid-1990.  Because of Sunbelt's management's focus on the millwork division, Sunbelt's core business (pressure-treating lumber) also suffered.  Nonetheless, Sunbelt had over $1.8 million in retained earnings as of the close of its fiscal taxable year ended June 26, 1993.

Events Leading to Ridge's Distribution of the Sunbelt Stock to Ridge's Shareholders

In 1982, Sunbelt began to borrow money from Citrus and Chemical Bank, in Bartow, Florida (the Bank), pursuant to a

---

[2]     There is a conflict between Stipulation of Facts 15, which recites that Sunbelt was incorporated in 1983, and Exhibit 43-J, Form 1120, U.S. Corporation Income Tax Return, 1992, for Sunbelt, which states that Sunbelt's date of incorporation is Oct. 16, 1981.  We may disregard a stipulation where it is clearly contrary to the evidence in the record, and we do so here.  See Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976).

series of renewable notes (the notes). Beginning in 1984, and until 1989, Ridge stood as a guarantor of the notes. Borrowings pursuant to the notes reached $2 million by 1989. On February 26, 1990, the board of directors of Ridge (the Ridge board) authorized the withdrawal of Ridge's guaranty of Sunbelt's debt to the bank (the Ridge guaranty) if there was not "a prompt cessation and controlled liquidation of the millwork division." Ridge could not force a shutdown of the millwork division because it was unable to outvote Hutto, who, like Ridge, was a 50-percent shareholder in Sunbelt. The Ridge board reasoned that, without the Ridge guaranty, Sunbelt would be unable to obtain new funds to cover future losses, and, as a result, Hutto would be forced to shut down the millwork division.

On May 18, 1990, Ridge withdrew the Ridge guaranty and, shortly thereafter, the millwork division was liquidated. On September 17, 1990, Ridge purchased Sunbelt's 1989 note (the 1989 note) from the Bank for $630,000, the balance due. Thereafter, Ridge financed Sunbelt directly by extending and modifying the 1989 note on numerous occasions. In that way, Ridge was able to exercise control over the management of Sunbelt.

In mid-1992, Hutto decided to sell his shares in Sunbelt and leave the company. Hutto's decision culminated several months of negotiations between Ridge and Hutto, in which Ridge sought either to purchase Hutto's interest in Sunbelt or sell its interest to Hutto. Ridge instigated those negotiations because

of its dissatisfaction with Hutto's management of Sunbelt. Earlier in 1992, Ridge and Hutto had tentatively agreed to a price of $825,000 for a 50-percent stock interest in Sunbelt, applicable whether Hutto was the buyer or the seller. Ridge and Hutto finally agreed that Ridge and Hutto would cause Sunbelt to redeem Hutto's shares in Sunbelt (the redemption) in exchange for $828,943.75 in cash and real estate valued at $101,000. The redemption was accomplished on January 15, 1993. Immediately thereafter, Ridge owned the only outstanding shares of Sunbelt.

Also on January 15, 1993, subsequent to the redemption, Ridge made a distribution with respect to its stock of all of its shares in Sunbelt (the distribution and the Sunbelt shares, respectively). The distribution was to petitioners, the sole shareholders of Ridge, pro rata. The Ridge board set forth its reasons for the distribution as follows:

> WHEREAS, Sunbelt's activities are regulated by the Environmental Protection Agency and the Florida Department of Environmental Regulation and are subject to certain provisions of state and federal environmental protection laws, including the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA). Any violation of such laws in the past or in the future by Sunbelt may subject Corporation [Ridge] to liability as a shareholder of Sunbelt for damages, fines or penalties; and
>
> WHEREAS, Sunbelt anticipates offering certain of its securities in a public offering in the future and the Corporation does not want to be involved in a public offering or to have the securities law obligations of a control shareholder of a public corporation; and

WHEREAS, if corporation continues to wholly own Sunbelt subsequent to the redemption, Sunbelt and Corporation will be prohibited from electing or maintaining their respective Subchapter S status for Federal tax purposes and for purposes of the income tax imposed by the State of Florida * * *

Funding the Redemption

Sunbelt needed cash in the amount of $828,243.74 to fund the redemption. Although Sunbelt had assets and accumulated earnings in excess of that amount, it did not have the necessary cash. On January 14, 1993, the amount available to Sunbelt pursuant to the 1989 note was increased from $2 million to $3 million, and, on that same date, Sunbelt took advantage of its increased borrowing power under the 1989 note and borrowed $900,000 from Ridge, which, in part, it used to make the redemption.

OPINION

I. Introduction

The fundamental question we must answer is whether gain is to be recognized to Ridge on account of the distribution. If so, then, since, for Ridge's taxable year ending July 25, 1993, it was an S corporation, petitioners must take into account their pro rata shares of such gain. See sec. 1366(a). No gain will be recognized to Ridge on account of the distribution if that transaction qualifies for nonrecognition treatment pursuant to section 355. The pertinent provisions of section 355(a) and

(c) are set forth in the margin.[3]  If the distribution does not

---

[3]      SEC. 355.   DISTRIBUTION OF STOCK AND SECURITIES
                   OF A CONTROLLED CORPORATION.

         (a) Effect on Distributees.--

            (1) General Rule.--If--

               (A) a corporation (referred to in this
               section as the "distributing corporation")

                  (i) distributes to a shareholder, with
               respect to its stock,  * * *

               *    *    *    *    *    *    *

            solely stock or securities of a corporation
            (referred to in this section as "controlled
            corporation") which it controls immediately before
            the distribution,

               (B) the transaction was not used principally
               as a device for the distribution of the
               earnings and profits of the distributing
               corporation or the controlled corporation or
               both * * *

               (C) the requirements of subsection (b)
               (relating to active businesses) are
               satisfied, and

               (D) as part of the distribution, the
               distributing corporation distributes--

                  (i) all of the stock and securities in the
               controlled corporation held by it immediately
               before the distribution, * * *

               *    *    *    *    *    *    *

            then no gain or loss shall be recognized to (and
            no amount shall be includible in the income of)
            such shareholder or security holder on the receipt
            of such stock or securities.

(continued...)

qualify for section 355 nonrecognition treatment, then gain will be recognized to Ridge pursuant to section 311(b).[4]  Moreover, the parties have stipulated that, if the distribution does not qualify for section 355 nonrecognition treatment, the deficiencies determined by respondent with respect to petitioners are correct.  Respondent argues that the distribution does not

---

[3](...continued)

               *    *    *    *    *    *    *

    (c) Taxability of Corporation on Distribution.--

        (1) In general.--* * * no gain or loss shall be recognized to a corporation on any distribution to which this section * * * applies and which is not in pursuance of a plan of reorganization.

[4]    Sec. 311(b) generally provides for a distributing corporation's recognition of gain on its distribution of appreciated property "as if such property were sold to the distributee at its fair market value."  Sec. 311(b) only applies to a corporate distribution of appreciated property to which subpart A (secs. 301-307) applies.  Sec. 355(a)(1), if applicable to this case, would provide an exception to dividend treatment under sec. 301 and, therefore, an exception to the application of sec. 311(b).  See sec. 355(c)(3).

We note, in passing, that, because Ridge's S corporation election was made on, not after, Dec. 31, 1986, sec. 1374, as amended by the Tax Reform Act of 1986 (TRA of 1986), Pub. L. 99-514, 100 Stat. 2085, does not apply to tax the alleged sec. 311(b) gain to Ridge.  See TRA of 1986 sec. 633(b); Rev. Rul. 86-141, 1986-2 C.B. 151, 152.  Sec. 1374 requires that "built-in gain" be taxed directly to an S corporation.  The pre-TRA of 1986 version of sec. 1374 applied only during the first 3 years (not the first 10 years as under the amended provision) for which an S corporation election was in effect.  See former sec. 1374(c)(1).  For Ridge, the applicable years were its 1988-90 taxable years.  Therefore, any taxable gain to Ridge arising out of the Jan. 15, 1993, distribution of the Sunbelt stock would not be subject to former sec. 1374.  Such gain would be directly taxable to the petitioner-shareholders pursuant to sec. 1366(a).

qualify for section 355 nonrecognition treatment on two separate

and independent grounds:

(1)  The contemporaneous redemption and distribution fail to

satisfy the requirements of section 355(b) as to active trade or

business.[5]  Specifically, respondent argues that, although

---

[5]     SEC. 355(b) provides:

(b) Requirements as to Active Business.--

   (1) In general.--Subsection (a) shall apply only if
either-

      (A) the distributing corporation, and the
   controlled corporation (or, if stock of more than
   one controlled corporation is distributed, each of
   such corporations), is engaged immediately after
   the distribution in the active conduct of a trade
   or business, or

      (B) immediately before the distribution, the
   distributing corporation had no assets other than
   stock or securities in the controlled corporations
   and each of the controlled corporations is engaged
   immediately after the distribution in the active
   conduct of a trade or business.

   (2) Definition.--For purposes of paragraph(1), a
corporation shall be treated as engaged in the active
conduct of a trade or business if and only if--

      (A) it is engaged in the active conduct of a
   trade or business, or substantially all of its
   assets consist of stock and securities of a
   corporation controlled by it (immediately after
   the distribution) which is so engaged,

      (B) such trade or business has been actively
   conducted throughout the 5-year period ending on
   the date of the distribution,

      (C) such trade or business was not acquired

(continued...)

Sunbelt had been engaged in an active trade or business for more than 5 years on the date of the distribution, control of Sunbelt was acquired by the distributing corporation (Ridge), within such 5-year period, in a transaction (the redemption) in which gain was recognized, thereby violating the requirements of section 355(b)(2)(D)(ii).

(2) Petitioners have failed to prove that the distribution was designed to achieve a corporate business purpose, as required by section 1.355-2(b), Income Tax Regs.

---

[5](...continued)
within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

(D) control of a corporation which (at the time of acquisition of control) was conducting such trade or business--

(i) was not acquired by any distributee corporation directly (or through 1 or more corporations, whether through the distributing corporation or otherwise) within the period described in subparagraph (B) and was not acquired by the distributing corporation directly (or through 1 or more corporations) within such period, or

(ii) was so acquired by any such corporation within such period, but, in each case in which such control was so acquired, it was so acquired, only by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions combined with acquisitions before the beginning of such period.

Because we agree with respondent's first ground, we do not address respondent's second ground.

II.  Active Business Requirement

A.  Pertinent Provisions of the Internal Revenue Code

One of the specific requirements for section 355 nonrecognition treatment on the pro rata distribution of the shares of a controlled corporation (a so-called spinoff) is that "the requirements of subsection (b) [of section 355] (relating to active businesses) are satisfied".  Sec. 355(a)(1)(C).  Section 355(b)(1)(A) provides that both the distributing and the controlled corporation must be "engaged immediately after the distribution in the active conduct of a trade or business".  Section 355(b)(2) defines the circumstances under which "a corporation shall be treated as engaged in the active conduct of a trade or business".  Section 355(b)(2)(B) provides that the trade or business must have been "actively conducted throughout the 5-year period ending on the date of the distribution" (the 5-year period).  Section 355(b)(2)(D) provides, in pertinent part, that control[6] of the corporation engaged in the active conduct of a trade or business on the date of acquisition of control must not have been acquired within the 5-year period or, if acquired within such period, it must have been acquired "only

---

[6]    For purposes of sec. 355, control is defined in terms of 80 percent of both voting control and share ownership.  See sec. 368(c).

by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions combined with acquisitions before the beginning of such period." Sec. 355(b)(2)(D)(ii).

B. Arguments of the Parties

Respondent does not dispute that both Ridge and Sunbelt were engaged in the active conduct of a trade or business immediately after the distribution. Nor does he dispute that both businesses had been actively conducted throughout the 5-year period. Respondent argues, however, that Ridge violated the conditions of section 355(b)(2)(D)(ii) because it acquired control of Sunbelt within the 5-year period in a transaction (the redemption) in which gain or loss was recognized.[7] In reaching that conclusion, respondent relies upon the statutory language and upon Rev. Rul. 57-144, 1957-1 C.B. 123, in which respondent determined that a personal holding company's distribution to its shareholders of the stock of one of its two controlled operating subsidiaries does not qualify as a tax-free spinoff where control of the

---

[7] It appears from the record that Hutto's basis in his Sunbelt stock was his initial investment of $66,667 (one-third of the total initial shareholder investment of approximately $200,000). Thus, Hutto's gain on the redemption was approximately $863,276.75 ($929,943.75 redemption price less $66,667 stock basis). Petitioners have not assigned error to respondent's finding that petitioners together realized and had recognized to them the same amount of gain on Ridge's same-day distribution to them of the same number of Sunbelt shares as were redeemed from Hutto, assuming sec. 355 is inapplicable to such distribution.

parent's other operating subsidiary (which was merged into the parent after the distribution) was obtained during the 5-year period as a result of that subsidiary's redemption of a portion of a more than 20-percent minority interest.

Petitioners respond that this case simply does not involve tax avoidance of a kind that the active business requirement of section 355(b) and, in particular, section 355(b)(2)(D) is designed to combat. In that regard, petitioners argue that (1) Ridge's accumulated adjustment account under section 1368(e)(1) (in this case, Ridge's undistributed, previously taxed earnings) exceeded the value of the distributed Sunbelt stock so that the distribution could not have constituted a taxable dividend to petitioners even if it had taken the form of a cash distribution (see sec. 1368(c)(1)), and (2) the redemption was not an acquisition of control by Ridge for purposes of section 355(b)(2)(D). Alternatively, petitioners argue that, even if the combined redemption-distribution is deemed to have violated the literal terms of the statute (since gain was, in fact, recognized to Hutto), respondent has allowed tax-free treatment for other transactions that failed to meet the literal statutory requirements for nonrecognition of gain. Petitioners claim that nonrecognition of gain is equally justified in this case. Petitioners also argue that the facts of Rev. Rul. 57-144, supra, are distinguishable from the facts of this case, and, therefore, it is not germane.

C.  Discussion

    1.  Acquisition of Control

We generally treat a revenue ruling as merely the Commissioner's litigating position not entitled to any judicial deference or precedential weight.  See, e.g., Norfolk S.S. Corp. v. Commissioner, 104 T.C. 13, 45-46 (1995), supplemented by 104 T.C. 417 (1995), affd. 140 F.3d 240 (4th Cir. 1998); Simon v. Commissioner, 103 T.C. 247, 263 n.14 (1994), affd. 68 F.3d 41 (2d Cir. 1995); Pasqualini v. Commissioner, 103 T.C. 1, 8 n.8 (1994); and Exxon Corp. v. Commissioner, 102 T.C. 721, 726 n.8 (1994). We may, however, take a revenue ruling into account where we judge the underlying rationale to be sound.  See Spiegelman v. Commissioner, 102 T.C. 394, 405 (1994) (citing Newberry v. Commissioner, 76 T.C. 441, 445 (1981)).  The degree to which we must respect the Respondent's longstanding position in Rev. Rul. 57-144, supra, is of no concern, however, because, in the circumstances of this case, we reach the same result.

First of all, we do not agree with petitioners that the facts in Rev. Rul. 57-144, supra, are distinguishable from the facts in this case in any significant way.  While it is true that the ruling involves (1) a parent holding company and two operating subsidiaries rather than, as in this case, a parent operating company and a single operating subsidiary, and (2) a taxable stock redemption by the retained rather than by the distributed subsidiary, those are distinctions of no legal

significance.   The key determination by respondent in Rev. Rul.
57-144, supra, which is relevant to this case, is the
determination that a parent corporation is considered to acquire
control of its subsidiary by virtue of the subsidiary's
redemption of the stock of another shareholder whose interest in
the subsidiary before the redemption exceeded 20 percent.

In opposition to that determination by respondent,
petitioners argue that, where control of the subsidiary is the
result of the subsidiary's redemption of its own stock, there is
no "acquisition" of control by the parent distributing
corporation as contemplated by section 355(b)(2)(D).   Again, we
disagree with that blanket assertion.   As one commentator has
noted:

> The literal statutory language supports the
> redemption rule of Rev. Rul. 57-144, since P acquired
> control of S as a result of a taxable transaction.
> Although the purpose of §355(b)(2)(D) to prevent
> Distributing from using its liquid assets to buy a
> corporation conducting an active business would not at
> first blush seem to be violated by a redemption of S
> stock before a spin-off (because P is not using any of
> its own assets in a way contrary to the purpose of
> §355(b)(2)(D)), the fungibility of cash makes such a
> redemption problematic.   It may be difficult to
> determine whether, in true economic effect, the cash
> used in the redemption could be attributed to P--as,
> for instance, if S used all of its cash normally used
> for its working capital requirements for the
> redemption, which P made up to S after the redemption.
> * * *

Ridgway, 776-2d Tax Mgmt. (BNA), Corporate Separations at A-42,
A-43 (2000) (fn. refs. & citations omitted; emphasis added).

In this case, all of the cash needed to accomplish the redemption came directly from Ridge, the parent distributing corporation. On January 14, 1993, Sunbelt borrowed $900,000 from Ridge. On the following day, Sunbelt redeemed all of Hutto's stock for $828,943.75, in cash, plus real estate with a value of $101,000. Petitioners specifically acknowledge that Sunbelt lacked sufficient liquidity to fund the redemption and, therefore, needed to borrow the necessary funds. Although, as petitioners point out, Sunbelt might have borrowed the funds from a third-party lender, it did not. Moreover, the negotiations between Hutto and Ridge prior to the redemption, whereby the two parties sought to terminate their joint ownership of Sunbelt by having one buy the stock of the other, clearly indicate that Ridge was the motivating force for the buyout of Hutto's interest in Sunbelt and that Sunbelt was, in effect, serving Ridge's purpose in accomplishing this goal. Any distinction between that series of transactions and an outright purchase of the stock by Ridge, the distributing corporation, is illusory for purposes of section 355(b)(2)(D)(ii).[8]

---

[8] See Waterman S.S. Corp. v. Commissioner, 430 F.2d 1185 (5th Cir. 1970), revg. 50 T.C. 650 (1968), in which the court held that, where a subsidiary-payor distributed a promissory note to its shareholder-payee in the form of an intercompany dividend, the payor's discharge of the note with funds borrowed from the purchaser of the payor's stock from the payee was, in substance, the purchaser's payment of additional purchase price for the stock.

Under Rev. Rul. 57-144, 1957-1 C.B. 123, section 355(b)(2)(D) applies to any taxable redemption during the 5-year period that results in control of the subsidiary by the distributing corporation.  We need not and do not decide whether we would reach the same result as Rev. Rul. 57-144, supra, in all such cases.  We decide only that we reach the same result under the circumstances of this case.

### 2.  Additional Arguments

In reaching our decision, we find none of petitioners' additional arguments persuasive.

### a.  Active Business Test

Petitioners argue that the fundamental goal of the active business test is to prevent shareholder withdrawal of accumulated earnings at capital gain rates, and that, because Ridge's accumulated adjustment account under section 1368(e)(1) exceeded the value of the distributed Sunbelt stock, an otherwise taxable distribution (including a cash dividend) would not have been taxable to petitioners.  Therefore, petitioners continue, there could not have been any conversion of ordinary income into capital gain.  Additionally, petitioners argue that the issue in this case, the taxation of corporate level gain, is not addressed by section 355(b)(2)(D).

Petitioners' first argument ignores the fact that, pursuant to sections 1367(a)(2)(A) and 1368(e)(1)(A), the accumulated adjustment account is reduced by the amount of the distribution

(the value of the distributed Sunbelt stock) thereby reducing the interval before additional distributions by Ridge would become taxable to petitioners.  Moreover, petitioners' argument proves too much, as it would also apply to Ridge's purchase of Hutto's Sunbelt stock directly from Hutto during the 5-year period.

Petitioners' additional argument (section 355(b)(2)(D) does not deal with corporate level gain) ignores the post-1986 evolution of section 355 (including amendments to section 355(b)(2)(D)) into a weapon against avoidance of the repeal of the General Utilities[9] doctrine, which, prior to its repeal by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 631(c), 100 Stat. 2085, 2272, generally provided for the nonrecognition of gain realized by a corporation on the distribution of appreciated property to its shareholders.  As noted by one commentator:

> It should not be surprising that more attention has been directed toward Section 355 today than was ever the case in the past.  From a tax perspective, its attraction is grounded on the fact that it is one of the few (some might say the only) viable opportunity to escape the repeal of the General Utilities doctrine.
> * * *

Gould, "Spinoffs:  Divesting in a Post-General Utilities World, with Emphasis on Practical Problems", 69 TAXES 889 (Dec. 1991); (fn. refs. omitted).  Indeed, petitioners themselves place obvious reliance upon section 355 to avoid taxation pursuant to section 311(b).

---

[9]    See General Utils. & Operating Co. v. Helvering, 296 U.S. 200 (1935).

    b.  Literal Compliance With Section 355 Not Always
        Required

Petitioners also argue that nonrecognition treatment is justified herein on the basis of case law and respondent's pronouncements in which nonrecognition of gain was afforded to a transaction despite a failure to satisfy the literal terms of the governing statute.  In general, the authorities cited by petitioners involve either (1) cash payments that are disregarded in determining the applicability of a nonrecognition provision, see Rev. Rul. 55-440, 1955-2 C.B. 226, Chief Counsel's Memorandum, formerly General Counsel's memorandum (G.C.M.), 33712 (Dec. 21, 1967), and G.C.M. 32868 (June 26, 1964) or (2) gain recognition transfers of assets or stock between affiliated corporations within the 5-year period that are held not to negate the tax-free treatment of a subsequent spinoff pursuant to section 355(b)(2)(C) or (D); see Commissioner v. Gordon, 382 F.2d 499 (2d Cir. 1967), revd. on other grounds 391 U.S. 83 (1968); Rev. Rul. 78-442, 1978-2 C.B. 143; Rev. Rul. 69-461, 1969-2 C.B. 52; G.C.M. 35633 (Jan. 23, 1974).

Both Rev. Rul. 55-440, supra, and G.C.M. 33712, supra, determine that the "solely for voting stock" requirement of a tax-free reorganization under section 368(a)(1)(B) is satisfied where, in connection with the reorganization, the acquired corporation purchases (redeems) some of its stock for cash. G.C.M. 32868, supra, determines that the cash redemption of

preferred stock from shareholders of both common and preferred, in connection with the acquisition of all of the common stock in a tax-free reorganization under section 368(a)(1)(C), is taxable to the shareholders under section 302 as a transaction separate from the reorganization. The cash is not "boot" taxable to the shareholders under section 356. In both of the G.C.M.'s, Counsel explicitly bases his determination on the fact that the acquired corporation used its own funds for the redemption. Although the issue of which corporation provided the funds for the redemption was not specifically addressed in Rev. Rul. 55-440, supra, it appears that such funds were, in fact, provided by the acquired corporation. We find that that feature, among others, of all three of the pronouncements distinguishes their facts from the facts of this case.

The other authorities relied upon by petitioners are also distinguishable because, in each, either the taxable acquisition (or incorporation) of the subsidiary to be spun off within the 5-year period or the spinoff itself less than 5 years after a taxable purchase of the subsidiary occurred within the context of an affiliated group of corporations. Thus, Commissioner v. Gordon, supra, involves a subsidiary spun off within 5 years of its incorporation in a transaction involving the receipt of "boot" (a demand note) taxable to the transferor parent. The Court of Appeals for the Second Circuit held that the section 355(b)(2)(C) and (D) prohibition against acquiring a business or

a corporation in a taxable transaction within the 5-year period must be restricted to acquisitions from outside the affiliated group in order to carry out the legislative intent of section 355(b), which, it concluded, was to prevent "the temporary investment of liquid assets in a _new_ business in preparation for a 355(a) division." _Id._ at 506 (emphasis added).[10]  Respondent adopted that reasoning in Rev. Rul. 78-442, _supra_, and Counsel did so in G.C.M. 35633, _supra_, both of which involve the incorporation of an operating division preparatory to a spinoff of the newly formed subsidiary in a transaction intended to qualify as a tax-free reorganization under section 368(a)(1)(D). In both pronouncements, the incorporation of the more-than-5-year-old division involves the assumption of liabilities in excess of the transferor's basis, resulting in gain recognized to the transferor under section 357(c).  Respondent and Counsel, like the Court of Appeals for the Second Circuit in _Commissioner v. Gordon_, _supra_, determined that section 355(b)(2)(C) is intended to prevent the acquisition of a new business from outside the affiliated group within the 5-year period. Therefore, they found no violation of that provision by virtue of

---

[10]    In _Baan v. Commissioner_, 45 T.C. 71 (1965), revd. and remanded 382 F.2d 485 (9th Cir. 1967), we reached the same result as the Court of Appeals for the Second Circuit, but on the ground (rejected by the Court of Appeals) that the incorporation of the subsidiary was, in fact, a nonrecognition transaction because the gain attributable to the receipt of boot was eliminated in consolidation.

the section 357(c) gain on the distributing corporation's incorporation of an existing business.[11]

In Rev. Rul. 69-461, supra, respondent determined that a distribution by a subsidiary to its parent of the stock of the former's subsidiary, within 5 years of the first-tier subsidiary's purchase of such stock, does not violate section 355(b)(2)(D). Respondent reasoned that section 355(b)(2)(D) is not intended to apply to a distribution "that merely has the effect of converting indirect control into direct control", but, rather, "applies to a transaction in which stock is acquired from outside a direct chain of ownership." Rev. Rul 69-461, 1969-2 C.B. at 53. Similarly, in Rev. Rul. 74-5, 1974-1 C.B. 82 (discussed by both parties), the parent distributee (P) purchases the stock of the subsidiary distributor less than 5 years prior to the latter's distribution of an operating subsidiary that it had owned for more than 5 years. Respondent determined that that conversion of P's indirect control into direct control of the distributed subsidiary within the 5-year period did not violate section 355(b)(2)(D) because there is no passthrough of P's

---

[11] Sec. 1.355-3(b)(4)(iii), Income Tax Regs., applicable to acquisitions prior to the Revenue Act of 1987, Pub. L. 100-203, 101 Stat. 1330, and the Technical and Miscellaneous Revenue Act of 1988, Pub. L. 100-647, 102 Stat. 3342, also provides that sec. 355(b)(2)(C) and (D) does not apply to an acquisition of assets or stock by one member of an affiliated group from another member of the same group, even if the acquisition is taxable.

"accumulated excess funds through another corporation to P shareholders".[12]

In this case, the redemption accomplished more than merely the conversion of indirect to direct control of Sunbelt. It accomplished the acquisition of control where none had existed previously. For that reason, it represents, in the language of the Court of Appeals for the Second Circuit in Commissioner v. Gordon, 382 F.2d at 506, "the temporary investment of liquid assets in a new business in preparation for * * * [a spinoff]". We hold that, in contrast to the circumstances involved in the pronouncements cited by petitioners, the distribution within 5 years of the redemption is precisely the type of transaction section 355(b)(2)(D) is designed to eliminate from nonrecognition treatment under section 355(a).

III. Conclusion

Respondent's deficiencies against petitioners are sustained.

Decisions will be entered

for respondent.

---

[12] In Rev. Rul. 74-5, 1974-1 C.B. 82, respondent further determined that parent distributee's (P's) subsequent distribution of the subsidiary stock to its shareholders, within the 5-year period, does violate the requirements of sec. 355(b)(2)(D). The prior distribution to P also violates sec. 355(b)(2)(D) as amended by the Revenue Act of 1987, sec. 10223(b), 101 Stat. 1330, supra, and sec. 2004(h)(1) of TAMRA, supra. As a result, Rev. Rul. 89-37, 1989 C.B. 107, obsoletes the holding of Rev. Rul. 74-5, supra, with respect to the distribution to P.